UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

IN RE:

THOMAS AND PATRICIA COTTINGHAM                     CASE NO. 09-22799

DEBTORS

JEROME EWERS, ET AL.                                        PLAINTIFFS

V.                                                ADVERSARY CASE NO. 10-2001

THOMAS COTTINGHAM, ET AL.                                    DEFENDANTS

**MEMORANDUM OPINION**

This matter is before the Court on allegations by the Plaintiffs Jerome Ewers and SPACES, Inc. ("SPACES") that a debt in excess of one million dollars is owed to them by the Debtor Thomas Cottingham and should be excepted from discharge pursuant to 11 U.S.C. §§523(a)(2)(A), 523(a)(4), and 523(a)(6).   Specifically, the Plaintiffs allege that Thomas conspired with his wife and Codebtor Patricia Cottingham, to embezzle and convert funds and other property from SPACES.   The Court conducted a trial on these issues on March 24, 2011.  Upon consideration of the parties' stipulation of facts, testimony and exhibits admitted into evidence, proposed findings of fact and conclusions of law, and the record, as well as arguments of counsel, this Court finds that the Defendant Thomas Cottingham did conspire with Patricia to convert embezzled funds and other property from SPACES such that Thomas owes a debt in the amount of $1,137,891.01 to the Plaintiff SPACES, Inc.   Further, this Court finds this debt excepted from Thomas Cottingham's discharge pursuant to 11 U.S.C. §523(a)(6).

**Facts**

In the late 1990's and early-to-mid 2000's, Codebtors Thomas and Patricia Cottingham were faced with difficult legal and financial circumstances.   They were saddled with thousands

of dollars in unpaid tax obligations to the IRS. Patricia and Thomas, a construction superintendent by trade with thirty-two years experience, were left with substantial income tax liability for the years 1995 and 1998 due to the failure of the construction company, Cottingham Construction. They also failed to pay their personal income taxes in 2000 and 2001, resulting in additional federal tax liens. The Debtors entered into agreements to make payments of $800 a month to pay off these tax liabilities. These payments were made in addition to their month-to-month living expenses, including but not limited to their payments for utilities and a rental payment of $750 per month for their residence at 22 St. Nicholas Place, Ft. Thomas, Kentucky.

On March 29, 2000, Patricia was indicted by a Hamilton County, Ohio, grand jury for embezzling funds from her former employer, Cardiology Associates. On May 1, 2000, Patricia pled guilty to felony embezzlement. She was sentenced to five years probation and required to pay $44,613.49 in restitution at the rate of $800 per month.

During this time, Thomas brought home a gross annual salary of $50-55,000, with take-home pay of about $750-$800 per week. Patricia's salary was roughly $30-35,000 annually, yielding about $600-650 in take-home pay per week. Thomas was also receiving $1,300 per month in annuity payments from a family wrongful death settlement in 1979. This income notwithstanding, they were unable to make ends meet and regularly faced unpaid creditors and collection agents.

In 2000, Patricia was hired as a bookkeeper and financial administrator for SPACES, an architectural design and construction firm headed by Jerome Ewers. Ewers gave Patricia control over the financial accounting entries and programs at SPACES. Her duties did not include check-signing authority. Despite Patricia's public conviction of embezzlement, Mr. Ewers was unaware of Patricia's criminal history.

Starting in 2001 and continuing into 2002, Patricia began embezzling funds from

SPACES.   In 2001 and 2002, Patricia embezzled $16,765.27 from SPACES.   She deposited some of those embezzled funds into the Debtors' joint checking account held by the Bank of Kentucky ("BOK") and the balance into their joint savings account held by Guardian Savings Bank ("Guardian").   The money was then subsequently used to fund their living expenses.

Both Thomas and Patricia had check-signing authority and wrote checks on the BOK joint account.   Both used the Guardian savings account to make salary deposits, withdraw cash, and issued cashier checks to pay certain bills, including Patricia's restitution payments.

In 2003, Patricia embezzled $64,328.30 from SPACES and deposited all of the embezzled funds into the Debtors' joint BOK checking account.   On June 2, 2003, three days after a $3,865.08 check embezzled from SPACES had been deposited into the joint BOK checking account, Thomas made a phone order to pay off a loan of $3,133.73 out of the funds in that account.   On December 1, 2003, the Debtors made another loan repayment of $4,860.05 two days after an embezzlement check from SPACES of $6,287.97 had been deposited into their joint BOK checking account.

In 2004, Patricia embezzled $88,244.60 from SPACES.   From January 2004 through July 2004, $44,649.06 of those embezzled funds was deposited into the Debtors' joint BOK checking account.   On February 25, 2004, a new computer was purchased and paid for with a $2,076.50 check drawn on the joint BOK checking account. That same day a check for $7,993.80, embezzled from SPACES, was deposited into that joint checking account.   In April 2004, a check for $3,800, drawn on the joint checking account, was issued to pay federal taxes for the tax year 2003.   An embezzled check for $6,313.05 was deposited into the joint checking account on the date taxes were due.   Finally, on June 29, 2004, funds embezzled from SPACES were used from the joint account to purchase a Jeep Wrangler vehicle.   The vehicle was paid for with a $4,500 check drawn on their joint BOK account and the purchase was made eight days after an embezzled check from SPACES for $5,383.87 was deposited into that same

3

account.

On August 13, 2004, Patricia opened a checking account in her own name with Fifth Third Bank. She alone had check signing authority on that account. From September 2004 through December 2004, $43,595.54 in checks embezzled from SPACES were deposited into that Fifth Third checking account. A bank card and checks were used to pay family expenses from that account and to move money to the other joint accounts held by the Debtors.

In addition to embezzling money from SPACES, Patricia stole furniture and other accessories from SPACES shortly after she began working there. The wholesale cost to SPACES of these stolen items was $127,156.02. The great majority of this stolen property was taken to the Cottingham home, where it was in plain view and used by the family.

In 2005, Thomas and Patricia deposited $32,539.49 from their paychecks into their various bank accounts. When those deposits were made, the Debtors collectively withdrew $8,663.44 in cash and issued checks to "cash" or made ATM cash withdrawals of $22,410.95. This resulted in a net deposit of $1,465.10 from Thomas and Patricia's earnings into their financial accounts for the entire year of 2005. Yet that same year, Thomas and Patricia spent $274,573.22 from their various bank accounts on living expenses. They also spent $13,317.27 in transfers to and purchases for their son Brandon and spent $6,285.58 for their son Dustin. In addition, the Debtors purchased $30,034.20 for cosmetic dentistry and other dental expenses and accumulated a total of $4,030.57 in medical expenses.

Their expenditures were funded by money embezzled from SPACES in the amount of $215,437.20, consisting of $213,544.61 in embezzled checks, and $1,892.59 by forged credit card purchases. The checks embezzled in 2005 were initially deposited into Patricia's Fifth Third checking account after which they were used to pay for family expenditures or deposited

into the joint accounts.   Patricia also created a forged credit card account that year by creating a false application with Fifth Third Bank. The billings on the forged credit card account were sent to the Debtors' family home, after which Patricia paid them using SPACES' funds.

Also during 2005 and early 2006, Thomas and Patricia had major interior and exterior renovations done on their St. Nicholas Place rental home, in anticipation of purchasing the home.   The Debtors spent $19,998.38 on landscaping, home improvement purchases, and the construction of a multi-tiered deck. They spent another $7,668.87 on a spa.   Additional orders through SPACES were placed for $16,449.86 in interior renovations and products installed in 2005 and another $3,826.38, done in early 2006.

During 2006, Thomas and Patricia withdrew more cash from their bank accounts than they deposited from their earnings. Specifically, they deposited $46,781.01 from their paychecks into their bank accounts. From those deposits, they took out $500 in cash at the time of deposit, and during that year the Debtors issued checks to "cash" or made ATM cash withdrawals of $49,109.00.   The cash withdrawals resulted in a negative $2,827.99, leaving no earnings at all in 2006 to fund the other expenditures shown in their banking records.

Although Thomas and Patricia took out more cash from their bank accounts in 2006 than they deposited from their earnings, they spent $391,731.16 from their various bank accounts that year.   To fund that spending during 2006, Patricia embezzled $286,213.31 from SPACES, the thefts consisting of $283,391.88 in embezzled checks and $2,821.43 in forged credit card purchases.

During 2006, the Debtors used embezzled funds to buy a new Jeep Commander for Thomas, which required a down payment of $9,717.00 on the vehicle.   Thomas was present when this purchase was made, and he knew the down payment for the vehicle came from Patricia's Fifth Third Bank account.   This down payment was made on the same day that an embezzled SPACES check for $5,918.40 was deposited into the account.   The balance of the

5

purchase price was financed through BOK, and Thomas became obligated for sixty months of payments at $666.72 per month.

In mid-2006, after buying the Jeep Commander, the Debtors decided to purchase a home at 2645 Carthage Road in California, Kentucky. Patricia approached Ewers, told him that she and Thomas were temporarily short on cash, and asked Ewers to provide a short-term loan of $30,000 to finance the home purchase. Thomas was informed about this loan by phone when Ewers agreed to it. Thomas and Patricia applied for a mortgage loan from BOK to finance the balance of their Carthage Road home purchase. To secure the mortgage loan, Patricia prepared a June 23, 2006 letter to BOK explaining that the $30,000 loan was actually a gift from a brother and forged Ewers' name to the letter. In further effort to procure the bank loan, Thomas wrote a letter to the loan officer explaining the family financial transactions and setting forth the details of the family debts.

Before the Debtors purchased the Carthage Road real estate, they were as a practical matter insolvent. Their stated liabilities on the loan application were $71,721, an amount greater than their stated assets, which were themselves falsely inflated. The Debtors' total retirement account assets were $32,430, and they had an obligation to repay Ewers for the $30,000 short-term loan. A house purchase would increase their monthly payment obligations to over $1,300 per month, plus insurance and real estate taxes.

After buying the Carthage Road home, the Debtors began spending large sums on their newly-purchased home. Thomas and Patricia spent $2,044.80 in moving expenses and over $30,000 in home improvement expenses, including kitchen flooring, counter-tops, new appliances, and more than $10,000 for a new heating, ventilation, and air conditioning system.

During 2006, the Debtors spent an additional $29,930.04 on their adult son, Brandon, and $5,529.58 for their second son, Dustin. This was in addition to $24,661.80 in dental and $4,014.92 in medical expenditures that year. In late 2006, the Debtors repaid the $30,000 due

6

Ewers for the down payment loan. The source of the repayment was several embezzled checks from SPACES and $15,198.72 taken from a retirement account.

In 2007, Thomas and Patricia took far more cash from their bank accounts than they deposited from their earnings. During that year, they deposited $47,124.80 from their paychecks into their bank accounts. From those deposits, they took out $5,400 in cash, and Thomas or Patricia issued checks to "cash" or made ATM cash withdrawals of $69,715.50. The cash withdrawals resulted in a negative $27,990.70, leaving no paycheck earnings in 2007 to fund their expenditures.

In 2007, the Debtors' spending increased. They spent $2,632.76 on a golf trip to Florida, $71,285.17 on a new swimming pool, patio, and pool house addition, driveway, and other exterior improvements to the Carthage Road property, $19,595.93 for down payments on four new vehicles, $37,979.20 for interior renovations and improvements, $12,230.50 for wedding expenses at the Carthage Road residence, and $15,393.78 and $19,974.16 for sons Brandon and Dustin, respectively. The total spending from the Debtors' bank accounts during 2007 (including the cash received) was $460,366.24. This was made possible by the embezzlement of funds from SPACES in the amount of $328,516.10.

In February of 2008, after Patricia already embezzled another $11,230.21 from SPACES, Ewers discovered Patricia's embezzlement and terminated her employment. In July of 2009, Patricia pled guilty to embezzlement and was sentenced to serve fifteen years in the Ohio Reformatory for Women and ordered to pay restitution to SPACES in the amount of $1.2 million. At trial, the Plaintiffs proved that $127,156.02 of property and $1,137,891.01 was stolen and embezzled from SPACES during the years 2001 to 2008. Thomas was not charged with any crime relating to the embezzlement or theft.

The Debtors filed for Chapter 7 relief on October 29, 2009. On January 7, 2010, the Plaintiffs filed this adversary proceeding seeking a judgment against the Debtors in the

approximate amount of $1.2 million and seeking a determination that the debt be deemed excepted from the Debtors' discharge pursuant to 11 U.S.C. §§523(a)(2)(A), 523(a)(4), and 523(a)(6). The Plaintiffs generally allege that Patricia and Thomas committed a conspiracy to embezzle and convert funds and property from them. Patricia has since voluntarily waived her discharge [Doc. 41 of Case No. 09-22799]. The Plaintiffs therefore proceeded to trial on their claims as against Thomas only.

## Conclusions of Law

This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I) over which this Court has jurisdiction pursuant to 28 U.S.C. §1334. Venue is proper pursuant to 28 U.S.C. §1409.

### A.    11 U.S.C. §523(a)(6)

A debt is non-dischargeable pursuant to 11 U.S.C. §523(a)(6) if it is incurred for "willful and malicious injury by the debtor to another entity or to the property of another entity." Under §523(a)(6), the term "willful" means "deliberate or intentional." *See Wheeler v. Laudani*, 784 F.2d 610, 615 (6th Cir. 1986). To prove willful behavior, a plaintiff must prove the debtor "believe[d] that the consequences [of his actions] are substantially certain to result from them." *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 464 (6th Cir. 1999) (*citing* RESTATEMENT (SECOND) OF TORTS §8A, comment a, p. 15 (1964)). In other words, a plaintiff must show that a debtor had an intent to do harm. *Id.* at 463. *See also Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (holding the actor must intend the consequences of the act and not just the act itself). The term "malicious" means "in conscious disregard of one's duties or without just cause or excuse." *Wheeler*, 784 F.2d at 615; *JGR Associates LLC v. Brown* (*In re Brown*), 442 B.R. 585, 615 (Bankr. E.D. Mich. 2011). "Malicious" conduct does not require ill-will or specific intent to do harm. *Wheeler*, 784 F.2d at 615.

The Plaintiffs argue that Thomas is responsible for the funds and property embezzled by Patricia and such debt is non-dischargeable pursuant to §523(a)(6) because Thomas knew of

Patricia's embezzlement and he participated in a scheme to convert the funds and property stolen from SPACES for their personal use to support a lifestyle beyond their means. *See Haemonetics Corp. v. Dupre (In re Dupre),* 238 B.R. 224 (Bankr. D. Mass. 1999) (holding a spouse's knowing participation in the subsequent conversion of embezzled funds is sufficient to support a finding of non-dischargeability on a concerted action theory for conspiring with the husband to willfully and maliciously injure employers' property by dissipating embezzled funds); *see also Synod of South Atlantic Presbyterian Church v. Magpusao (In re Magpusao),* 265 B.R. 492, 498-500 (M.D. Fla. 2001) (holding knowledge concurrent with participation in the use or enjoyment of stolen property is sufficient for liability to attach and a debt to be excepted from discharge pursuant to §523(a)(6)).

To prevail, the Plaintiffs must prove (1) Thomas had knowledge of Patricia's embezzlement of funds and property from the Plaintiffs and (2) Thomas participated in a scheme with Patricia to convert or otherwise deprive the Plaintiffs of their property. *In re Dupre,* 238 B.R at 229. The Plaintiffs seek to prove both Thomas' knowledge and participation by asserting that their claims against Thomas arise from a civil conspiracy to embezzle and convert funds.

Civil conspiracy can take two forms: (1) a particular combination of defendants which is itself wrongful, without regard to the tortious nature of the underlying conduct or (2) as one deriving from concerted action, whereby liability is imposed on one individual for the tort of another. *In re Dupre*, 238 B.R. at 228; *see also Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995) (defining conspiracy in Kentucky as "an "unlawful/corrupt combination or agreement between [two or more persons]... to do by some concerted action an unlawful act."); *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859,868 (Ohio 1998) (defining civil conspiracy as " 'a malicious combination of two or more persons to injure another person or property in a way not competent for one alone, resulting in actual damages.'"). Of the two forms of conspiracy, the Plaintiffs are

alleging the latter, or a conspiracy deriving from a concerted action where liability is imposed on Thomas for the tortious acts of Patricia.

Thomas has consistently denied any knowledge of Patricia's embezzlement activities at SPACES. Because conspirators rarely advertise their involvement in a scheme and conspiracies often entail secrecy, circumstantial evidence of the conspiracy's existence is necessary. A defendant's knowledge of and participation in a conspiracy may be inferred from conduct and established by circumstantial evidence. *See United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008).

The evidence overwhelmingly shows that Thomas had knowledge of Patricia's embezzlement and subsequent conversion of the embezzled funds. Thomas and Patricia had a combined yearly salary of no more than $105,000, including Thomas' monthly annuity payments. Yet their annual expenditures were, at the height of their spending, as large as four times that amount. This is despite clear financial limitations based not only on payment of prior tax liens but also payment on Patricia's restitution order. While debtors that come through this Court often have expenditures that greatly exceed their incomes (hence their need to file bankruptcy), such a large disparity in the Debtors' combined income as compared to their expenditures most certainly put Thomas on notice as to the excessive and unusual amounts of funds flowing in and out of the Debtors' bank accounts.

Furthermore, the Debtors shared joint bank accounts into and from which many of these funds flowed. Thomas has testified even though they shared bank accounts, his wife controlled the finances and he had little involvement. This testimony is not credible. The evidence shows that Thomas not only had access to those accounts to determine what funds were flowing in and out of them, but also that he from time to time wrote checks and made deposits. In addition, Thomas signed tax returns, corresponded with the IRS over their tax liens, and signed the paperwork indicating their financial status for the loan for their new home

on Carthage Road. His knowledge of the family finances is further exemplified by the letter he wrote to the loan officer explaining the family's financial transactions and the family's debt. Thomas was well aware of his own income and that of his wife, as well as their obligations of $800 per month to pay the IRS and $800 per month to pay Patricia's restitution order. Thomas had sufficient access to and involvement in the family's finances to be charged with knowledge of their financial circumstances and the money being deposited and withdrawn from those accounts to fund their lifestyle.

Thomas was also involved in several key financial decisions that contradict and discredit his testimony that he was an innocent and passive bystander. For example, Thomas participated in the purchase of several new vehicles, including the purchase of his new Jeep Commander that required a down payment of $9,717.00 on the vehicle. Thomas was present at the purchase and obligated himself for sixty months of payments at $666.72 each despite having only recently finishing major interior and exterior renovations on their St. Nicholas Place rental home in an amount in excess of $40,000. This was the same year that the Debtors deposited only $46,781.01 from their paychecks into their bank accounts and made cash withdrawals of $49,109.00.

Furthermore, Thomas had knowledge of the $30,000 loan from Ewers to purchase the new home; however, immediately upon the purchase of the home, he participated in a $30,000 spending spree for home improvements despite knowing the obligation to repay Ewers remained outstanding. Thomas didn't need to see the actual payments or invoices on the expenses for the improvements to know the value of those improvements - his thirty-two years in the construction industry show that he was well versed in the cost of such renovations even if he was not aware of the exact numbers. This Court is hard-pressed to believe that he would not have known that the expenditures on the home improvements were substantial.

In 2007, the spending on luxury items only increased with the purchase of the golf trip to

Florida, extensive interior renovations and improvements as well as exterior renovations including a new swimming pool, patio, pool house addition, driveway, other exterior improvements to the Carthage Road property, and four new vehicles. Thomas acted as his own general contractor for much of the 2007 exterior improvements and again, his construction experience leads this Court to believe that he knew what this endeavor would cost. Thomas' testimony that these improvements, costing approximately $71,656.21, would be funded from sums remaining in their retirement accounts, approximately $17,000, is just not credible. Moreover, this massive increase in spending, so shortly after a period of difficult financial circumstances, and without an increase in salary or infusion of income, begs the question of how Thomas could not know that something was amiss, particularly where he was clearly enjoying the luxury that was purchased by the embezzled funds with a wife who had been previously convicted of embezzlement? "Where the specter of suspicion is present, there is a duty to be cautious in the use of tainted funds." *In re Magpusao*, 265 B.R. at 500.

Considering (1) the significant disparity between the Debtors' income and expenses, a disparity that continued to increase over the course of the embezzlement; (2) Thomas' access to and participation in the family's finances; (3) the cost of the home improvements; and (4) Thomas' knowledge that Patricia had recently pled guilty to embezzling funds from her prior employer, Thomas cannot conveniently stick his head in the sand and say that he did not have knowledge of Patricia's activities until the day she admitted her guilt. His proffered ignorance is not credible – Thomas could not reasonably have believed that they were living within their means.

The evidence clearly shows that Thomas was an active participant in the conversion of the stolen funds and property. He substantially used and enjoyed the fruits of Patricia's illegal acts. Both Patricia and Thomas converted the embezzled money and property for their own enjoyment to fund a lavish lifestyle that they clearly and obviously could not afford. Such use

and enjoyment of the funds/property stolen from SPACES, particularly over a period of seven years, coupled with the strong evidence of Thomas' knowledge of Patricia's illegal acts, is sufficient proof of Thomas' knowledge and participation to make Thomas liable for the converted funds and property.  *In re Dupre*, 238 B.R. at 229.

Thomas' (1) knowledge of his wife's embezzlement and (2) his participation in the conversion of the stolen funds and property for his own use and benefit in order to fund an extravagant lifestyle rises to the level of the "willful" and "malicious" conduct contemplated by §523(a)(6).  *See In re Dupre*, 238 B.R. at 229; *In re Magpusao*, 265 B.R. 500-501. Accordingly, Thomas owes a debt to SPACES in the amount of $1,137,891.01 which is non-dischargeable pursuant to §523(a)(6).  There is no proof of any debt owed to Plaintiff Ewers.

### B.    11 U.S.C. §523(a)(4)

A debt is non-dischargeable pursuant to 11 U.S.C. §523(a)(4) if it is incurred "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  It is undisputed that while Patricia has been convicted of embezzlement, Thomas has not been convicted of any crime.  Hence the Plaintiffs seek to impute Patricia's tortious acts to Thomas through a conspiracy theory.  *See Moore Automotive Group, Inc. v. Lewis (In re Lewis)*, 424 B.R. 455 (Bankr. E.D. Mo. 2010).

The parties do not dispute that the Plaintiffs entrusted the funds and property to Patricia and not Thomas.  Nor is there any proof that Thomas committed any overt act in furtherance of Patricia's embezzlement.  Thus, while the evidence support's Thomas' knowledge of Patricia's criminal activity, the Plaintiffs have produced no evidence that Thomas participated in any acts of embezzlement.  Further, Thomas' use or enjoyment of the stolen property is not sufficient to establish participation in the embezzlement.  *See Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002) (rejecting the proposition that the necessary element of scienter

under §523(a)(4) may be imputed from the embezzler to his or her spouse or significant other where the spouse or significant other knows of the embezzlement and such knowledge is "concurrent with the participation in the use or enjoyment of the stolen property."). Therefore, the Plaintiffs cannot prevail under §523(a)(4).

### C.       11 U.S.C. §523(a)(2)(A)

11 U.S.C. §523(a)(2)(A) states "a discharge under section 727...of this title does not discharge an individual debtor from any debt –

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by –
>> (A)   false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...

To prevail under §523(a)(2)(A), the Plaintiffs must prove: (1) the debtor obtained money through a material misrepresentation that at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the Plaintiffs; (3) the Plaintiffs justifiably relied on the false representation; and (4) the Plaintiffs' reliance was the approximate cause of their loss. *See Rembert v. AT&T Universal Card Services (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). The Plaintiffs must prove each of these elements by a preponderance of the evidence. *Id.*

The Plaintiffs' seek to impute Patricia's acts on that of Thomas based on a conspiracy theory under §523(a)(2)(A) as well, but the Plaintiffs' conspiracy theory is only good so far as the Plaintiffs' proof that Patricia, in embezzling funds from them, obtained the money through a material misrepresentation that she knew was false or made with gross recklessness to its truth. The evidence does not support this conclusion. The Plaintiffs presented no proof of any material misrepresentations made by Patricia (or Thomas for that matter) to Ewers or SPACES upon which the Plaintiffs justifiably relied to their detriment. To the extent that Patricia was stealing money and other property from SPACES, Ewers has testified that this occurred without

his knowledge; thus, he cannot rely upon what he does not know.

The only possible facts that would support this theory under §523(a)(2)(A) are those relating to the $30,000 loan given by Ewers to Patricia for a down payment on the Debtors' new home.  However, any alleged misrepresentations made about the origin of that loan were made to the bank, which is not a party to this action, not the Plaintiffs.  Furthermore, Ewers testified that this loan has since been repaid in full, so the Plaintiffs have suffered no loss.

The Plaintiffs have presented no evidence of a material misrepresentation made to them by Patricia or Thomas upon which the Plaintiffs justifiably relied upon to their detriment. Therefore, the Plaintiffs' cause of action under §523(a)(2)(A) fails.

### Conclusion

The foregoing constitutes the Court's findings of fact and conclusions of law.  In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referred to in this decision.  A separate order shall be entered accordingly.

Copies to:

Edward Jacobs, Esq.

C. Ed Massey, Esq.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
***The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.***



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge
Dated: Friday, May 27, 2011
(tnw)**